UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

Norstan Apparel Shops, Inc.
d/b/a Fashion Cents, *et. al.,*

        Debtors.
------------------------------------------------------------x
Official Committee of Unsecured Creditors
of Norstan Apparel Shops, Inc.,

         Plaintiff,

-against-

Norman Lattman, Stanley Lattman, Lattman
Irrevocable Family Trust, Jessica Lattman Trust,
and Stanley & Ellen Lattman Trust,

        Defendants.
------------------------------------------------------------x

Case Nos. 05-15265-608
05-15268-608

Chapter 11

Adv. Pro. No. 06-01279-608

## DECISION

Appearances:

Ronald Sussman, Esq.
Jeffrey L. Cohen, Esq.
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY 10036
Attorneys for Plaintiff

Anthony C. Acampora, Esq.
Silverman Perlstein Acampora LLP
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753
Attorney for Defendants

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Norman Lattman, Stanley Lattman, Lattman Irrevocable Family Trust, Jessica Lattman Trust, and Stanley & Ellen Lattman Trust (collectively, the "defendants") seeking to dismiss the complaint in this adversary proceeding commenced by the Official Committee of Unsecured Creditors of Norstan Apparel Shops, Inc. (the "Committee").  The defendants argue that the complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12 and 19 and that the breach of fiduciary duty claim is barred by Pennsylvania's statute of limitations.  The defendants also argued that the Committee lacked standing to assert the breach of fiduciary duty claim, but that argument has been withdrawn.  Tr.[1] at 24.  For the foregoing reasons, the defendants' motion is denied.

<u>Jurisdiction</u>

The Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (H) and (O) and the Eastern District of New York standing order of reference dated August 28, 1986.

<u>Facts</u>

The following is a summary of the complaint's allegations.

Norstan Apparel Shops, Inc. ("Norstan") is a women's budget apparel retailer.  Complaint at Prelim. Stmt.  It was formed in 1954 under the laws of Pennsylvania and maintained its principal offices in Long Island City, New York.  <u>Id.</u> at ¶ 6.  In 1986, Norstan elected S-Corporation status.  <u>Id.</u> at ¶ 17.  Until 2002, Norstan operated successfully, its capital structure included no secured debt and its debt to equity ratio never exceeded 1.7 to 1.0.  <u>Id.</u> at Prelim.

---

[1] "Tr." refers to the transcript of the hearing held on September 21, 2006.

Stmt.  From 1998-2001, Norstan's revenues increased from $79.6 million to $113.1 million.  <u>Id.</u> at ¶ 21.

Prior to 2002, Norman Lattman ("Norman") was the president and director of Norstan, and controlled 50% of its shares either directly or through trusts.  <u>Id.</u> at ¶ 8.  Stanley Lattman ("Stanley," and together with Norman, "the Lattmans") was the treasurer and secretary of Norstan, and also controlled 50% of its shares either directly or through trusts.  <u>Id.</u> at ¶ 9.  The Lattman Irrevocable Family Trust owned approximately 6.67% of Norstan's shares.  <u>Id.</u> at ¶ 10.  The Jessica Lattman Trust owned approximately 3% of Norstan's shares.  <u>Id.</u> at ¶ 11.  The Stanley and Ellen Lattman Trust owned approximately 16.83% of Norstan's shares.  <u>Id.</u> at ¶ 12.

On or about March 2002, an S-Corporation distribution of $14,223,592.00 (the "FY2002 Transaction") was effectuated, which constituted a distribution to Norstan's shareholders of 182% of Norstan's net income and 13.4% of its gross revenues from 2002.  <u>Id.</u> at ¶ 24.  Previously, Norstan's S-Corporation distributions averaged 77% of Norstan's net income and 2.6% of its gross revenues of the fiscal year.  <u>Id.</u> at ¶ 23.

In early 2002, the Lattmans hired Sperry Mitchell & Company ("Sperry Mitchell"), an investment banking firm, to market Norstan and to sell or merge it "for reasons of personal liquidity."  <u>Id.</u> at ¶¶ 26, 28.  On September 18, 2002, a leveraged buyout transaction ("LBO") closed whereby an investment group led by FSC Partners V, LP ("FSC") purchased the defendants' interests in Norstan for more than $55 million.  <u>Id.</u> at ¶ 29.  Norstan's previously unencumbered assets were used as collateral to secure loans to finance the purchase totaling $38.4 million from AmSouth Bank, Allied Capital Corporation and Gleacher Mezzanine Fund P, L.P. (collectively, the "banks").  <u>Id.</u> at ¶¶ 30, 31, n. 1.  Under the structure of the LBO, the loan

proceeds used to finance the transaction were conveyed directly to the defendants and not to the company.  Id. at ¶ 32.  The defendants received $52,499,999.00 in consideration for their interests in Norstan and, in January 2003, received a tangible net worth adjustment of $3,525,966.00.  Id. at ¶ 33.  The Lattmans remained as officers and directors of Norstan after the LBO.  Id. at ¶¶ 8, 9.

After the LBO, Norstan had unreasonably small capital.  Id. at ¶ 42.  As early as the LBO closing date, Norstan drew on a line of credit from the banks to pay the fees and costs incurred in the LBO, because it had no other source of funds to pay those amounts.  Id. at ¶ 43.  Norstan was also forced to borrow money from the banks' revolving credit lines to pay the debts it owed to those same banks.  Id. at ¶ 45.  In the winter of 2003, Norstan was unable make the scheduled payments on its debts as they matured.  Id. at ¶ 46.  In March 2004, to acquire liquidity, Norstan negotiated a forbearance agreement with the banks to increase its average working capital to 2.1% of its average net sales.  Id. at ¶ 47.  Between June 2002 and June 2003, Norstan's available working capital declined by $5.6 million.  Id. at ¶ 39.  For the 5 ½ years before the LBO, Norstan's average working capital averaged 27% of net sales and 30% of its total assets.  Id. at ¶ 40.  For the 2 ½ years after the LBO, its average working capital was 2.1% of its net sales and 1% of its total assets.  Id. at ¶ 41.

On April 8, 2005, Norstan and its affiliate filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Id. at ¶ 50.  On May 31, 2005, a sale of substantially all of Norstan's assets for $17 million was approved.  Id. at ¶ 51.  On July 5, 2005, a stipulation was approved among the debtors, the Committee and pre and post-petition senior and subordinated

lenders, pursuant to which the Committee was given the right to bring avoidance actions on behalf of the debtors' estates.

On May 9, 2006, the Committee commenced this adversary proceeding against the defendants alleging that the payments made to the defendants in connection with the LBO and the FY2002 Transaction were constructive fraudulent conveyances to the Lattmans and their family trusts pursuant to New York Debtor & Creditor Law ("DCL") §§ 273, 274 and 275, and that the Lattmans breached their fiduciary duties to Norstan's unsecured creditors.

Legal Standard and Analysis

The defendants' motion to dismiss is governed by Federal Rules of Civil Procedure 12 and 19, applicable in this proceeding pursuant to Federal Rules of Bankruptcy Procedure 7012 and 7019.

I.  Fed. R. Civ. P. 12(b)(6)

A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). The court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally" when determining the complaint's sufficiency. Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d (1986).

Pursuant to Federal Rule of Civil Procedure 8(a), applicable in this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7008, the plaintiff "need only set forth a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.), 341 B.R. 451, 453 (Bankr. S.D.N.Y. 2006).  The purpose of the complaint is to provide fair notice of the claim and the grounds upon which it rests.  Conley, 355 U.S. at 47.

A.  11 U.S.C. § 546(e)

The defendants argue that the payment made to the defendants in connection with the LBO cannot be avoided as a fraudulent conveyance because it is a "settlement payment" and is therefore exempted from avoidance by the safe harbor provisions of § 546(e).  The Committee argues that the payment made to the Lattmans in connection with the  LBO is not a "settlement payment" within the meaning of § 546(e), and that even if it could be characterized as such, § 546(e) should not apply because the payment does not implicate the policy considerations behind that section.

Section 546(e) limits the avoidance and recovery powers created by § 544 of the Bankruptcy Code.  See 11 U.S.C. § 546(e).  It provides that a pre-petition settlement payment may not be avoided if it is "made by or to a commodity broker, forward contract merchant, stockbroker, financial institution or securities clearing agency."  Id.  Section 741(8) defines a settlement payment as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).  Because the

payment to the Lattmans for their shares in Norstan was made by one or more financial

institutions (the banks), defendants argue that it is protected by § 546(e).

Judicial inquiry must begin with the text of the statute. See Hartford Underwriters Ins.

Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d. 1 (2000).

However, "where the plain language, even if literally applicable, would yield absurd results at

odds with the statutory design, courts may look beyond the printed word to the law as a whole

and its purposes and policy." Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263

B.R. 406, 478 (S.D.N.Y. 2001) (citing Mass. v. Morash, 490 U.S. 107, 115, 109 S. Ct. 1668, 104

L. Ed. 2d 98 (1989)).

Some courts have broadly interpreted "settlement payment" as "any transfer of cash or

securities made to complete a securities transaction." See Enron Corp. v. Bear, Stearns Int'l Ltd.

(In re Enron), 323 B.R. 857, 866 (Bankr. S.D.N.Y. 2005) (citing Walsh v. Toledo Hosp. (In re

Fin. Mgmt. Scis., Inc.), 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001)); Kaiser Steel Corp. v. Pearl

Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1237 (10th Cir. 1991); 5 COLLIER ON

BANKRUPTCY, 546.06[2][b] (Alan N. Resnick & Harry J. Sommer eds., 15th ed. Rev. 2006). A

"transaction" is "a completed agreement between a buyer and a seller." Kaiser, 952 F.2d at

1239, n. 7. However, these definitions must be considered in light of the modifying phrase "or

any other similar payments commonly used in the securities trade" and, therefore, the payments

"must be 'restricted to the securities trade.'" Bear, Stearns, 323 B.R. at 866 (citing Kipperman v.

Circle Trust F.B.O. (In re Grafton Partners, L.P.), 321 B.R. 527, 538 (B.A.P. 9th Cir. 2005)).

"The securities industry utilizes a 'clearance and settlement' system, wherein parties use

intermediaries to make trades of public stock which are instantaneously credited, but in which

the actual exchange of stock and consideration therefor takes place at a later date." <u>Zahn v.</u>

<u>Yucaipa Capital Fund</u>, 218 B.R. 656, 675 (D.R.I. 1998).

In deciding whether a transaction is a "settlement payment" within § 546(e), courts have

considered whether:

> (1)    the transactions have [previously] settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market;

> (2)    consideration was paid out in exchange for the securities or property interest as part of settlement of the transaction;

> (3)    the transfer of cash or securities effected contemplates consummation of a securities transaction;

> (4)    the transfers were made to financial intermediaries involved in the national clearance and settlement system; [and]

> (5)    the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked.

<u>Adler, Coleman</u>, 263 B.R. at 479 (internal citations omitted).

Courts have extended the "safe harbor" provisions of § 546(e) to various transactions

involving publicly traded companies, including leveraged buyouts and repurchase agreements.

<u>Grafton</u>, 321 B.R. at 539; <u>See also</u> <u>Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)</u>,

181 F.3d 505, 515-16 (3d Cir. 1999); <u>Wyle v. Howard, Weil, Labouisse, Freidrichs Inc. (In re</u>

<u>Hamilton Taft & Co.)</u>, 114 F.3d 991, 993 (9th Cir. 1997); <u>Jonas v. Resolution Trust Corp. (In re</u>

Comark), 971 F.2d 322, 325-26 (9th Cir. 1992); Jonas v. Farmer Bros. Co. (In re Comark), 145

B.R. 47, 52 (B.A.P. 9th Cir. 1992); Kaiser, 952 F.2d at 1240; Kaiser Steel Corp. v. Charles

Schwab & Co. (In re Kaiser Steel Corp.), 913 F.2d 846, 850 (10th Cir. 1990); Bevill, Bresler &

Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n., 878 F.2d 742, 752-53 (3d Cir.

1989).  However, courts have also declined to apply § 546(e) to certain transactions involving

the transfer of securities as well.  "[C]ommon elements in decisions finding that there is not a

protected settlement payment are that the securities involved are not publicly traded and public

markets are not utilized."  Grafton, 321 B.R. at 539.

It is important to recognize that Congress enacted § 546(e) "to minimize the displacement

caused in the commodities and securities markets in the event [of] a major bankruptcy affecting

those industries," and "to prevent the 'ripple effect' created by 'the insolvency of one commodity

or security firm from spreading to other firms and possibly threatening the collapse of the

affected industry."  Adler, Coleman, 263 B.R. at 477 (quoting H. Rep. No. 97-420, at 1 (1982),

reprinted in 1982 U.S.C.C.A.N. 583).  The term "settlement payment" must be understood in

light of this purpose, recognizing that the "securities industry encompasses a wide range and

variety of transactions, representing investments of staggering proportions and entailing

corresponding national economic implications.  These interests demand stability and certainty in

settled transactions, and legal definitions adaptable to the usage, understanding and realities of

the market."  Id.

Thus, while the term "settlement payment" as used in § 546(e) "is to be read broadly, the

term is not boundless."  Id. at 478 (internal quotations omitted).  Many courts have found the

definition of the term, which is contained in § 741(8) of the Bankruptcy Code, to be unhelpfully

circular.  See Zahn, 218 B.R. at 675 (describing the statutory definition as "circular and cryptic"); Brandt v. Hicks, Muse & Co., (In re Healthco Int'l, Inc.), 195 B.R. 971, 983 (Bankr. D. Mass. 1996) (the statutory definition "is as opaque as it is circular").  As one court noted, § 741(8) "essentially provides that a settlement payment is a settlement payment."  Zahn, 218 B.R. at 675.

But this is not quite accurate.  The definition of "settlement payment" contained in § 741(8) is saved from complete circularity by the concluding phrase, "or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  It is therefore important to give meaning to this modifying language, because in its absence, the statutory definition contained in § 741(8) would be, in effect,  a meaningless tautology.  See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 15 L. Ed. 2d 339 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations omitted).

For this reason, and in the context of the legislative history of these provisions, the modifying phrase at the end of § 741(8) must be understood, at a minimum, to mean that in order to be encompassed in the statutory definition of "settlement payment," a transaction must involve the public securities markets.   The "securities trade" in this statutory context plainly means the public securities markets.  To stretch the statutory definition of "settlement payment" to include any payment made for securities, whether or not involving the public securities markets, would not only deprive the definition of meaning, it would also render superfluous the statutory examples of types of settlement payments enumerated in § 741(8).

It is axiomatic that a statute is not to be interpreted in such a way as to render any of its provisions superfluous or meaningless. Id. Nor may a statute be interpreted so as to lead to an absurd result, at odds with the expressed legislative intent. Helvering v. Hammel, 311 U.S. 504, 510-511, 61 S. Ct. 368, 85 L. Ed. 303 (1941) ("[C]ourts in the interpretation of a statute have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute.") (internal citations omitted). If the term "settlement payment" in § 546(e) is construed to encompass any payment made for securities, whether or not involving a public securities market, then any leveraged buyout, if structured as a direct purchase of stock from the shareholders (like the instant transaction) would fall within § 546(e)'s safe harbor and thereby be immunized from avoidance under § 544 or § 548(a)(1)(B) of the Bankruptcy Code. This interpretation flies in the face of the extensive body of jurisprudence under which leveraged buyouts challenged under § 544 or § 548 have been analyzed for fairness and adequacy of consideration. See e.g., In re Best Products Co., 168 B.R. 35 (Bankr. S.D.N.Y. 1994); Crowthers McCall Pattern, Inc. v. Lewis, 129 B.R. 992 (S.D.N.Y. 1991); Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488 (N.D. Ill. 1988); United States v. Gleneagles Inv. Co., 565 F. Supp. 556 (M.D. Pa 1983), aff'd sub nom. United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), cert. denied, 483 U.S. 1005, 107 S. Ct. 3229 (1987). Such an interpretation of § 741(8) would also yield the absurd result of placing transactions involving, for example, exchange of cash for shares of stock in a cooperative apartment corporation within § 546(e)'s safe harbor. These anomalous results are not compelled by the statutory language. "Securities trade," in this context, must be understood to mean transactions in the public markets.

Since  the transfer to the Lattmans and their family trusts which is sought to be avoided in this action does not involve publicly traded securities or otherwise implicate the public securities markets, the transfer is not a "settlement payment" within the meaning of § 741(8) of the Bankruptcy Code.

B.  New York Debtor & Creditor Law ("DCL") §§ 273, 274 and 275

The defendants argue that the complaint fails to plead the necessary elements of constructive fraudulent conveyances under DCL §§ 273, 274 and 275.  The Committee contends that the pleadings are sufficient under Rule 8.

Section 544(b) of the Bankruptcy Code permits the avoidance of any transfer that may be avoided under applicable state law.  See 11 U.S.C. § 544(b).  Therefore, DCL §§ 273, 274 and 275 may be used to avoid constructive fraudulent conveyances.  See 11 U.S.C. § 544(b); N.Y. DEBT. & CRED. LAW §§ 273, 274, 275.  A transfer is constructively fraudulent under the DCL if it was made without fair consideration and (1) the debtor is insolvent or will be rendered insolvent; (2) the debtor is engaged in business and will be left with unreasonably small capital; or (3) the debtor intended or believed that it would incur debts beyond its ability to pay them as they mature.  See N.Y. DEBT. & CRED. LAW §§ 273, 274, 275; See also Geron v. Schulman (In re Manshul Constr. Corp.), 2000 WL 1228866, *51 (S.D.N.Y. August 30, 2000).

Rule 8, made applicable in this proceeding by Bankruptcy Rule 7008, governs the sufficiency of constructive fraudulent conveyances pleadings.  SIPC v. Stratton Oakmont, Inc., 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1999).  Rule 8 provides that a plaintiff need only set forth a "short and plain statement of the claim showing that [he] is entitled to relief."  Fed. R. Civ. P.

8(a)(2).  The purpose of this statement is to provide fair notice to the defendants of the claim and the grounds upon which it rests.  Conley, 355 U.S. at 47.

The court is required to accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Amalgamated Bank of N.Y. v. Marsh, 823 F. Supp. 209, 215 (S.D.N.Y. 1993).  The court's consideration is limited to the assertions made in the complaint, to documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents upon which the plaintiff relied in bringing suit.  Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993). "In short, '[t]he function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Amalgamated Bank, 823 F. Supp. at 215 (quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)).

1.  DCL § 273

The defendants argue that the complaint does not plead that Norstan was insolvent at the time of the LBO.  The Committee argues that the complaint pleads the insolvency element of DCL § 273.

Section 273 of the DCL provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  N.Y. DEBT. & CRED. LAW § 273.  An entity is insolvent "when the present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured." N.Y. DEBT. & CRED. LAW

§ 271.  To determine whether a company is insolvent, New York courts focused "on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets."  Hirsch v. Gersten (In re Centennial Textiles, Inc.), 220 B.R. 165, 173 (Bankr. S.D.N.Y. 1998).

A presumption of insolvency arises where the debtor makes a conveyance without fair consideration.  See Sullivan v. Messer (In re Corcoran), 246 B.R. 152, 163 (E.D.N.Y. 2000); United States v. Alfano, 34 F. Supp. 2d 827, 845 (E.D.N.Y. 1999).  Once it is established that the transfer was in exchange for less than fair consideration, the transferee has the burden to overcome the presumption of insolvency by showing that the debtor was solvent after the transfer.  Corcoran, 246 B.R. at 163.

Here, the complaint alleges that Norstan's assets were encumbered to secure the loan taken to purchase the company.  Complaint at ¶ 30.  The complaint also alleges that the defendants received the sale proceeds from the LBO and that Norstan did not receive anything in exchange for the encumbrance of all of its previously unencumbered assets.  Id. at ¶¶ 32-34.  Therefore, the complaint alleges that Norstan did not receive fair consideration, if any, in exchange for the encumbrance of its assets.  Since the presumption of insolvency would arise if the lack of fair consideration is proven, the burden would then shift to the defendants to prove that Norstan was solvent after the LBO.  In an effort to prove this, the defendants attached Norstan's audited 2000 and 2001 financial statements to their motion.  These financial statements, which are not incorporated in the complaint, may not be considered in this motion.

Thus the complaint, when read most favorably to the Committee, contains allegations which give rise to a presumption of insolvency.  These allegations are sufficient at the pleading stage.

Even without this presumption, the complaint pleads the insolvency element of DCL § 273 because it alleges that Norstan was rendered insolvent by the LBO.  See N.Y. DEBT. & CRED. LAW § 273.  The defendants argue that the complaint contains conclusory allegations that Norstan was rendered insolvent by the LBO and the FY2002 Transaction.  See Def. Mem. In Supp. at 16; Complaint, at ¶¶ 25, 48, 49.  However, those allegations are not the only facts pleaded regarding Norstan's insolvency.  The complaint also contains factual allegations that Norstan was rendered insolvent through the encumbrance of all of its assets, and the distribution to shareholders in the FY2002 Transaction, and that Norstan was forced to borrow money to pay the closing costs of the LBO and the debts of its prior loans.  Additionally, the complaint alleges that Norstan's working capital dropped from 29% of its net sales and 30% of its total assets to 2.1% of its net sales and 1% of its total assets.  Id. at ¶¶ 40, 41.  These allegations sufficiently plead that Norstan was rendered insolvent as a result of the LBO and provides the defendants with the notice required by Federal Rule of Bankruptcy Procedure 7008 of the claim asserted against them.  Therefore, the defendants' motion to dismiss the DCL § 273 claim is denied.

2. DCL § 274

The defendants argue that the complaint fails to allege that Norstan was left with unreasonably small capital after the LBO.  The Committee contends that the complaint sufficiently pleads this allegation.

Section 274 of the DCL provides:

> Every conveyance made without fair consideration when the
> person making it is engaged or is about to engage in a business or
> transaction for which the property remaining in his hands after the
> conveyance is an unreasonably small capital, is fraudulent as to
> creditors and as to other persons who become creditors during the
> continuance of such business or transaction without regard to his
> actual intent.

N.Y. DEBT. & CRED. LAW § 274.

Although the DCL does not define "unreasonably small capital," it has been defined as "a

financial condition short of equitable insolvency."  See MFS/Sun Life Trust-High Yield Series v.

Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (quoting Moody v. Sec.

Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992)).  In other words, the transferor "is

technically solvent but doomed to fail."  Id.  To determine adequacy of capital, a court will

consider "such factors as the company's debt to equity ratio, its historical capital cushion, and the

need for working capital in the specific industry at issue," as well as whether the company's

projections were reasonable and prudent when they were made.  Id.  The sufficiency of the

working capital need only be examined within a reasonable time after the transaction.  Id.

The defendants submit documents purporting to be Norstan's financial projections and

argue that they were reasonable and prudent when made.  Defs. Mem. in Supp. at 19.  However,

this is not, as the defendants argue, the determining factor; it is only one of several

considerations. See MFS/Sun, 910 F. Supp. at 944.  Furthermore, the financial projections and

the Sperry Mitchell memorandum submitted by defendants may not be considered on this motion

because those documents are not attached to the complaint as exhibits or incorporated in it by

reference, and it is not apparent that those documents were relied upon in preparing the complaint.  See Brass, 987 F.2d at 150.

The defendants also argue that Norstan's line of credit and its ability to borrow funds is valuable, suggesting that the line of credit should be considered as working capital.  Defs. Mem. in Supp. at 19.  Even if this were true, the complaint nonetheless pleads the "unreasonably small capital" element of DCL § 274.  As mentioned above, the complaint alleges that, for the five and a half years before the LBO, Norstan's working capital averaged 29% of its net sales and 30% of its total assets.  Complaint at ¶ 40.  The complaint alleges that after the LBO, Norstan's working capital averaged 2.1% of its net sales and 1% of its total assets.  Id. at ¶ 41.  The complaint also alleges that Norstan needed to borrow funds in order to pay costs as early as the closing date of the LBO, and within a few months of the LBO was unable to make its scheduled payments to its secured lenders.  Id. at ¶¶ 43, 46.  These allegations sufficiently plead that the LBO left Norstan with unreasonably small capital.  The defendants' motion to dismiss the DCL § 274 claim is therefore denied.

### 3.  DCL § 275

The defendants argue that the complaint fails to allege that they intended or believed that Norstan would incur debts beyond its ability to pay them.  The Committee asserts that the complaint alleges that element of DCL § 275.

Section 275 of the DCL provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. LAW § 275.

Although it is true that the complaint does not state that the defendants "intended or believed that Norstan would incur debts beyond its ability pay them as they mature," it can be inferred from all of the allegations that the defendants knew that Norstan would not be able to pay its debts as they matured.  The complaint alleges that the defendants effectuated the FY2002 Transaction and the LBO in close proximity to each other.  Complaint at ¶¶ 24, 29.  The complaint also alleges that the LBO caused all of Norstan's previously unencumbered assets to become encumbered, and resulted in a sharp decline in Norstan's working capital, such that it was forced to borrow money to pay the closing costs of the LBO, as well as other debts.  Id. at ¶¶ 30, 43.  It can be inferred that the defendants, who had successfully managed Norstan before the LBO, knew that Norstan would become unable to pay its debts as they matured.  See Gregory, 243 F.3d at 691 (the court must "draw inferences from [the complaint's] allegations in the light most favorable to plaintiff").  Therefore, the defendants motion to dismiss the DCL § 275 claim is denied.

II.  Statute of Limitations

The defendants argue that the breach of fiduciary duty claim is barred by Pennsylvania's two year statute of limitations.  The Committee argues that New York's statute of limitations applies because New York maintains a more significant interest in this claim than Pennsylvania. The Committee also argues that if Pennsylvania's statute of limitations applies, then the adverse domination doctrine also applies to toll the commencement of the limitations period until October 2004.

Under New York choice of law rules, corporate governance issues are generally governed by the laws of the state of incorporation.  See Galef v. Alexander, 615 F.2d 51, 58 (2d

Cir. 1980); In re Luxottica Group S.p.A., Sec. Litig., 293 F. Supp. 2d 224, 237 (E.D.N.Y. 2003);

BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999); Solow v.

Stone, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), aff'd, 163 F.3d 151 (2d Cir. 1998); Lachman v.

Bell, 353 F. Supp. 37, 39-40 (S.D.N.Y. 1972).  This is known as the internal affairs doctrine,

"which recognizes that only one [s]tate should have the authority to regulate a corporation's

internal affairs - matters peculiar to the relationships among or between the corporation and its

current officers, directors and shareholders - because otherwise, a corporation could be faced

with conflicting demands."  Roselink Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 225

(S.D.N.Y. 2004) (quoting Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S. Ct. 2629, 73 L. Ed.

2d 269 (1982)).  This doctrine exists because "the state of incorporation has an interest superior

to that of other states in regulating directors' conduct of the internal affairs of its own

corporations," and therefore is simply an "application of the New York rule . . . that the law of

the state with the greatest interest in the issue governs."  BBS, 60 F. Supp. 2d at 129.  However,

the internal affairs doctrine does not always control when the claims asserted belong to "third

parties external to the corporation."  Roselink, 386 F. Supp. 2d at 225 (quoting First Nat'l City

Bank v. Banco Para El Comercio Exterior de Cuba, 103 U.S. 611, 621, 103 S. Ct. 2591, 77 L.

Ed. 2d 46 (1983)).  In that instance, New York law dictates that the court conduct an "interest

analysis" and apply the law of the state which has the greatest interest in the claim.  Id.

The complaint alleges that the Lattmans breached their fiduciary duties to Norstan's

unsecured creditors, which arose once Norstan became insolvent.  See Official Comm. of

Unsecured Creditors of Forman Enters., Inc. v. Forman (In re Forman Enters., Inc.), 281 B.R.

600, 610 (Bankr. W.D. Pa. 2002) (directors of an insolvent corporation owe fiduciary duties to

the corporation's creditors).  In the bankruptcy context, where the injury resulting from breach of

an officer or director's fiduciary duty is to all creditors as a class, the claim may only be brought

by a trustee or the debtor in possession.[2]  <u>Solow</u>, 994 F. Supp. at 178.  "This rule is intended to

promote the orderly and equitable administration of a bankrupt's estate by preventing individual

creditors from pursuing separate actions to the detriment of other creditors and of the estate as a

whole."  <u>Id.</u>  At the same time, a trustee or debtor in possession may only assert claims held by

the bankrupt corporation, not the creditors.  <u>Pereira v. Farace</u>, 413 F.3d 330, 342 (2d Cir. 2005);

<u>Mediators, Inc. v. Manney (In re Mediators, Inc.)</u>, 105 F.3d 822, 825-826 (2d Cir. 1997).

Though these two rules may seem inconsistent, they are not, because "claims that injure all

creditors as a class normally belong to the corporation." <u>Pereira</u>, 413 F.3d at 342.

      The Committee argues that it asserts a claim for breach of fiduciary duty, standing in the

shoes of the debtor in possession, on behalf of the estate and its creditors.  Tr. at 34.  At first

glance, it may seem as though this claim asserts the rights of creditors, who are external to the

corporation, and does not implicate the internal affairs of the corporation.  Upon closer analysis,

however, it becomes apparent that the claim alleges a breach of fiduciary duty to the corporation.

<u>See</u> <u>Pereira</u>, 413 F.3d at 342 (stating that "breach of fiduciary duty claims belong to the

corporation," even when the trustee asserted the claims on behalf of creditors); <u>See also</u>

<u>Claybrook v. Morris (In re Scott Acquisition Corp.)</u>, 344 B.R. 283, 289 (Bankr. D. Del. 2006)

(stating that "a director's fiduciary duty to creditors is derivative of the duty owed to the

corporation").  As one court explained:

---

[2] <u>See</u> 11 U.S.C. § 1107(a) (providing that a debtor in possession "shall have all the rights . . . and powers
and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter.")

       [B]ecause of the [corporation's] insolvency, creditors would have
standing to assert that the . . .  directors had breached their
fiduciary duties by improperly harming the economic value of the
[corporation], to the detriment of the creditors who had legitimate
claims on its assets.  No particular creditor would have the right to
recovery; rather, all creditors would benefit when the [corporation]
was made whole and the [corporation's] value was increased,
enabling it to satisfy more creditor claims in order of their legal
claim on the [corporation's] assets.  In other words, even in the
case of an insolvent [corporation], poor decisions by directors that
lead to a loss of corporate assets and are alleged to be . . . breaches
of equitable fiduciary duties remain harms to the corporate entity
itself.  Thus, regardless of whether they are brought by creditors
when a company is insolvent, these claims remain derivative, with
either shareholders or creditors suing to recover for a harm done to
the corporation as an economic entity and any recovery logically
flows to the corporation and benefits the derivative plaintiffs
indirectly to the extent of their claim on the [corporation's] assets.
The reason for this [is that] the fact of insolvency does not change
the primary object of the director's duties, which is the
[corporation] itself.  The [corporation's] insolvency simply makes
the creditors the principal constituency injured by any fiduciary
breaches that diminish the [corporation's] value and logically gives
them standing to pursue these claims to rectify that injury.  Put
simply, when a director of an insolvent corporation, through a
breach of fiduciary duty, injures the [corporation] itself, the claim
against the director is still one belonging to the corporation."

Scott Acquisition, 344 B.R. at 289 (quoting Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863

A.2d 772, 792 (Del. Ch. 1992).

       Therefore, since claims asserting breaches of fiduciary duty belong to the corporation,

seeking recovery for "harms to the corporate entity itself" the internal affairs doctrine controls

and Pennsylvania's statute of limitations applies.  Id.  Put differently, while the debtor in

possession (here acting through the Committee) has standing to assert claims for injury to all

creditors as a class, "it does not imply that the [debtor in possession's] rights are greater than the

rights the corporation would have against malfeasant directors."  Pereira, 413 F.3d at 342.

The statute of limitations may be tolled if the adverse domination doctrine applies.  This doctrine provides that "the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers" and "is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."  <u>Resolution Trust Corp. v. Farmer</u>, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994).

The defendants argue that the complaint does not allege that they had "full, complete, and exclusive control" over Norstan.  The Committee contends that the adverse domination doctrine applies because the defendants controlled Norstan after the LBO closed, until October 2004.  In the alternative, the Committee argues that questions of material fact exist which would warrant denial of the defendants' motion to dismiss this claim.

The complaint alleges that after the LBO closed in September 2002, the Lattmans continued to serve as president and executive vice president of Norstan.  Complaint at ¶¶ 8, 9.  The complaint also alleges that, at all times after the LBO, members of FSV served as directors and officers of Norstan.  <u>Id.</u> at ¶ 15.  The Committee stated that the Lattmans were "dismissed" from their positions in October 2004, which suggests that the Lattmans were not in control of Norstan.  <u>See</u> Committee's Obj. to Defs.' Mot. to Dismiss, at ¶55.  However, the Committee later stated that the Lattmans were senior officers and directors until the "board of directors, including the Lattmans, collectively decided it was time to terminate the company's relationship with the Lattmans."  Committee's Letter dated September 27, 2006.  It should also be noted that the record does not reflect whether any other members of Norstan's board or its officers were "wrongdoers."

It is apparent that questions of fact exist concerning the applicability of the adverse domination doctrine. Accordingly, it is inappropriate to grant the defendants' motion to dismiss the breach of fiduciary duty claim. See Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.), 324 B.R. 575, 581-582 (Bankr. W.D. Pa. 2005) ("The adverse domination theory raises numerous questions of material fact which cannot be resolved as a matter of law on a motion to dismiss."); Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp.), 179 B.R. 457, 470 (Bankr. E.D. Pa. 1995); Schwartz v. Kursman (In re Harry Levin, Inc.), 175 B.R. 560, 579 (Bankr. E.D. Pa. 1994).

III. Fed. R. Civ. P. 19

The defendants seek to dismiss the complaint pursuant to Fed. R. Civ. P. 19 for failure to join the banks as necessary parties. Defendants argue that because the LBO must be analyzed as a single integrated transaction, all of the parties to the transaction, including the banks, must be joined in this action, "as joint tortfeasors or otherwise." Defendants' Reply Memo, p. 14. However, defendants fail to offer any coherent explanation why the banks are necessary parties in this proceeding.

Rule 19, made applicable via Bankruptcy Rule 7019, sets forth a two step process in determining whether a party is a necessary and indispensable party. United States v. Sweeny, 418 F. Supp. 2d 492, 499 (S.D.N.Y. 2006). Rule 19(a) states, in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of that action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave

> any of the persons already parties subject to a substantial risk of
> incurring double, multiple, or otherwise inconsistent obligations by
> reason of the claimed interest.

Fed. R. Civ. P. 19(a).

If a party is deemed necessary under Rule 19(a), but it is not feasible to join him, then the court must "assess whether or not, in equity and good conscience, the action should proceed in the necessary party's absence." Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1124 (2d Cir. 1990). The court need not consider whether dismissal is warranted unless Rule 19(a)'s threshold standard is met. Id. at 1123.

The inability to accord "complete relief" without the missing party, as stated in Rule 19(a)(1), refers only "to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought." Arkwright-Boston Mfrs. Mut. Ins. Co. v. N.Y., 762 F.2d 205, 209 (2d Cir. 1985). Here, the complaint seeks the property transferred, or the value of the property, from the defendants. If the Committee succeeds, complete relief may be granted by requiring the defendants to turn over value of the property fraudulently transferred. Therefore, the joinder of the banks is not necessary to afford complete relief to the Committee in this action.

Nor are the banks necessary parties under Rule 19(a)(2). The Committee has settled its fraudulent transfer claims with the banks, and therefore, cannot join the banks as parties because it does not have a claim against them. The outcome of this action will not affect the terms of the settlement, and therefore, the banks are not "so situated that the disposition of the action in [their] absence may as a practical matter impair or impede [their] ability to protect that interest." See Fed. R. Civ. P. 19(a)(2)(i).

Nor have the defendants explained how they would be "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations," as stated in Rule 19(a)(2)(ii), if the banks are not joined.  Even if the banks and the defendants were joint tortfeasors, joinder would not be required.  An action against one tortfeasor may proceed without the joinder of a joint tortfeasor, because the liability is joint and several.  <u>Crowthers McCall Pattern, Inc. v. Lewis</u>, 129 B.R. 992, 1003 (S.D.N.Y. 1991).

Therefore, the banks are not necessary and indispensable parties to this adversary proceeding under Rule 19.

<u>Conclusion</u>

For all of the foregoing reasons, the defendants' motion to dismiss the complaint is denied.

Dated: Brooklyn, New York
       March 30, 2007

                                        <u>***s/Carla E. Craig***</u>
                                        CARLA E. CRAIG
                                        Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

Norstan Apparel Shops, Inc.
d/b/a Fashion Cents, *et. al.,*

                    Debtors.

------------------------------------------------------------x

Official Committee of Unsecured Creditors
of Norstan Apparel Shops, Inc.,

                         Plaintiff,

-against-

Norman Lattman, Stanley Lattman, Lattman
Irrevocable Family Trust, Jessica Lattman Trust,
and Stanley & Ellen Lattman Trust,

                    Defendants.

------------------------------------------------------------x

Case Nos. 05-15265-608
          05-15268-608

Chapter 11

Adv. Pro. No. 06-01279-608

<u>MAILING CERTIFICATE</u>

     I, Sharon L. Weiss, hereby affirm that on March 30, 2007 a copy of a decision was served on the parties named below by United States Postal Service first class mail, telecommunication, facsimile or any other delivery method, as follows:

Ronald Sussman, Esq.
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY 10036

Jeffrey L. Cohen, Esq.
Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY 10036

Anthony C. Acampora, Esq.
Silverman Perlstein Acampora LLP
100 Jericho Quadrangle
Suite 300
Jericho, NY 11753

Jeff J. Friedman
Katten Muchin Rosenman
575 Madison Avenue
New York, NY 10022

Dated: Brooklyn, New York
       March 30, 2007

                              ***s/Sharon L. Weiss***
                              Sharon L. Weiss